## Thomas v. Kennedy

*Alphonsus L. Casey,* for plaintiff.

*Martin B. Gormley* and *Frank J. Gormley,* for defendants.

HOBAN, P. J., June 29, 1955.—Action in equity to compel the trustees of the Anthracite Health and Welfare Fund to pay a pension to plaintiff as a retired anthracite miner. The complaint avers the establish-

ment of the fund, the authority of the trustees, the qualification of plaintiff as a beneficiary of the fund by reason of membership in the United Mine Workers of America, employment in the anthracite industry for more than 20 years, attainment of age 60 and retirement from work thereafter, and the refusal of the trustees to pay plaintiff a pension. The relief asked is a mandatory order compelling defendants to pay plaintiff a pension, to include amounts due from the time of application, interest on delayed payments and costs.

The answer justifies the trustees' refusal because a resolution of the trustees establishes certification of membership by the United Mine Workers of America as a prerequisite of qualification for benefits from the fund and plaintiff was not a member in good standing of the U. M. W. A. at the time of his application as certified to by the proper union authorities.

From the pleadings and the evidence the issues developed as follows:

Were the trustees justified as a matter of law in relying on certification of membership by the U. M. W. A. as the final test of qualification as to membership in the union of a prospective beneficiary of the fund?

Are the proceedings to establish certification as to union membership according to union law subject to review by a court of equity?

Was plaintiff in fact, regardless of certification, a member in good standing of the U. M. W. A. at the time of filing his application?

Is plaintiff entitled to benefits as a beneficiary of the fund, and if so as of what date?

### Findings of Fact

1. The Anthracite Health and Welfare Fund is the result of an agreement of June 7, 1946, between the

United Mine Workers of America (Districts 1, 7 and 9—The Anthracite Districts) and the anthracite operators, as supplemented and amended. The money is provided by the anthracite operators, the fund is managed by trustees, and by the terms of the agreement is constituted an irrevocable trust.

2. The section of the trust agreement pertinent to this controversy is as follows:

"4. The Fund shall be used for making payments to mine workers and their dependents and survivors, with respect to (i) wage loss not otherwise compensated for at all, or adequately, under the provisions of Federal or State Law and resulting from sickness (temporary disability), permanent disability, death or retirement, and (ii) other related welfare purposes, as determined by the trustees. Subject to the stated purposes of the Fund, the trustees shall have full authority with respect to questions of coverage and eligibility, priorities among classes of benefits, amounts of benefits, methods of providing or arranging for provisions of benefits and all related matters."

3. Plaintiff William A. Thomas was a worker in classified employment in and around the anthracite mines from 1925 to August 31, 1947, and during that period he was a member in good standing in the United Mine Workers of America. As of August 31, 1947, plaintiff was a member of Local 1022, U. M. W. A., composed of employes at the Jermyn Colliery, Hudson Coal Company. Plaintiff's union dues for August 1947 were paid.

4. On August 31, 1947, plaintiff's place of employment was shut down, plaintiff and other employes thereof were laid off and the operation of the colliery was discontinued and not resumed.

5. As of August 31, 1947, the constitution of the International Union, U. M. W. A., adopted September 19, 1944, was the governing law of the union and re-

mained so to November 1948, when a new constitution was adopted.

The constitution of 1944 contains these pertinent provisions:

"*Article XIV: Local Unions, How Formed and Governed.* . . .

"Sec. 11. Any member becoming three months in arrears for dues or assessments, unless officially exonerated from the payment of same, shall forfeit his membership and can be reinstated only by paying an initiation fee and such other penalties as may be imposed by the District in which application for membership is made. . . .

"Sec. 21. When a mine is abandoned indefinitely and all the members of the Local Union having jurisdiction over it have gone to work elsewhere, the Local Recording Secretary must notify the District Secretary of the fact and the District Secretary must make application to the International Secretary-Treasurer for exoneration for the Local Union for each month the mine is idle. . . .

"Sec. 23. No Local Union shall be exonerated from payment of per capita tax or assessments when the members have worked five days or more during said month; and it is understood that individual members of the Local Union who have not worked five days in any one month may be exonerated from the payment of dues and assessments by the Local Unions of which they are members, provided that such members are idle through no fault of their own. All individual members so exonerated must be reported to the International and District organizations on the report required by Sections 15 and 16 of this Article."

6. In September 1947, plaintiff went to the secretary of Local 1022, U. M. W. A., asked for information as to his union dues as affected by his unemployment and the secretary informed plaintiff, "You are

exonerated", and on further request as to when he should resume payments, the secretary said he would let plaintiff know.

7. On October 27, 1947, plaintiff obtained employment with the Pennsylvania Department of Highways and worked there until December 31, 1947, when he was laid off.

8. During the period October 27, 1947, to December 31, 1947, plaintiff again consulted the secretary of Local 1022, informed the secretary that plaintiff was working, and asked the secretary about paying dues. The secretary told plaintiff that he would let plaintiff know when to start paying dues.

9. Plaintiff was reëmployed by the Pennsylvania Department of Highways March 15, 1948, and remained in employment therewith to January 20, 1955, with the exception of one month in 1950.

10. Effective November 1, 1948, the constitution of the International Union, U. M. W. A., was changed to provide as follows:

"Retired members and disabled members receiving aid and those receiving State Workmen's compensation payments, also members temporarily unemployed through no fault of their own, shall pay one dollar per month dues, to be forwarded by the Local Union to the International Secretary-Treasurer and a record of such members filed with the District Secretary-Treasurer": Sec. 12, art. XIV.

11. Early in November 1948, the secretary of Local 1022 informed plaintiff that plaintiff was to pay dues at the rate of $1 per month.

12. Plaintiff paid dues to the secretary, Local 1022, at the rate of $1 per month each month from November 1948 to and including June 1949.

13. In July 1949, plaintiff was informed by the secretary, Local 1022, that from then on plaintiff was to pay dues at the rate of $4 per month.

14. Thereafter plaintiff paid dues to Local 1022 at the rate of $4 per month from July 1949 to and including September 1950.

15. Plaintiff became 60 years of age on May 24, 1950.

16. In June 1950, plaintiff went to Bochak, secretary of Local 1022, notified the secretary that plaintiff was 60 years of age and that plaintiff would like to apply for a pension. Thereupon the secretary made up the application for pension which indicates that it was executed by plaintiff, June 27, 1950.

17. Plaintiff's application was processed by the trustees as follows:

The application was received on June 30, 1950; immediate application was made to the Social Security Board in Baltimore, Maryland, for plaintiff's social security record; at the same time application was made to the office of District No. 1, U. M. W. A., for confirmation of plaintiff's membership. Within three weeks information was returned to the trustees that plaintiff was working for the Pennsylvania Department of Highways. Thereupon the office of District No. 1 was notified and additional information as to plaintiff's status was requested. That office advised the trustees that plaintiff was not working in classified employment under the Anthracite Wage Agreement at the time of his application. Then the trustees advised the secretary-treasurer of District No. 1 that if there was any change in plaintiff's status to notify the trustees. The application was then placed on file. Thereafter a supervisor for the trustees notified the officers of the local union that the trustees refused to proceed further with the claim.

The trustees did not at any time prior to the filing of the complaint in equity furnish any direct notice to plaintiff of any decision in the matter, nor that processing of the claim was discontinued. Plaintiff

at no time prior to filing the complaint in equity made any personal contact with the trustees with reference to the prosecution of his claim.

18. Pertinent resolutions of the trustees providing for the establishment of a pension fund, standards of eligibility for benefits and administrative rules and regulations are summarized in chronological order as follows:

(a) *Resolution of July 23, 1948*, appropriates money to a separate pension and retirement fund and provides for pensions at the rate of $100 per month to "each eligible and qualified member of the United Mine Workers of America, Districts 1, 7 and 9, who, on June 1, 1946, attained or thereafter attains the age of 62 years and who has served 20 years in the Anthracite Coal Industry in the State of Pennsylvania on a date subsequent to June 1st, 1946; that the effective date for qualification for the payment of pensions shall be as of the date that the member of the United Mine Workers of America has retired from the Anthracite Coal Industry in the State of Pennsylvania after attaining the age of 62 years and has served 20 years in the industry. . . ."

The right is reserved to the trustees to modify the foregoing conditions, both as to amounts of pension payments and qualifications for eligibility, as future operating experience may require.

(b) *Resolution of July 26, 1948*, provides eligibility standards and rules requiring membership in U. M. W. A., prohibits forced retirement by operators and prescribes methods of proof of membership, age and service.

"*Proof of Membership.* Membership in the United Mine Workers of America must be certified to by the Local Union and confirmed by the District in accordance with the rules and laws of the United Mine Workers of America.

"The International Union shall have final say in all matters pertaining to membership in the United Mine Workers of America."

(c) *Resolution of April 18, 1949*, reduces age requirement for pension eligibility from 62 to 60, retains other eligibility requirements and ratifies and confirms resolution of July 23, 1948, as amended and supplemented.

(d) *Resolution of January 15, 1954*, reduces pension payments to $50 per month commencing with payments for December 1953, restates and revises the rules as to eligibility and proofs, makes the appropriate district secretary the confirming authority as to membership of the applicant in the U. M. W. A. "after due investigation of his status," requires the retention of membership in the U. M. W. A. during the receipt of pension payments, applies the revised rules to applications pending but not acted upon on the date of resolution.

The resolution defines "Retirement" as: "Retirement from service shall be when the member of the United Mine Workers of America permanently ceases to work in the Anthracite Coal Industry."

19. On October 2, 1950, the secretary-treasurer of District No. 1 notified plaintiff that in connection with plaintiff's pension application, favorable consideration could not be given to plaintiff's membership eligibility because plaintiff had been employed by the Pennsylvania Department of Highways since 1947: "To the present time, during which period of employment you did not protect your membership through the payment of dues in accordance with Section 12, Article XIV of the International Constitution." Plaintiff protested, investigation was made, and thereafter on November 15, 1950, the secretary-treasurer notified plaintiff that a reëxamination of the district ledgers indicated that payments by plaintiff were recorded

therein at the rate of $1 per month from November 1948 to and including July 1949, and at the rate of $4 per month from August 1949 through August 1950, that confusion of similar names caused the errors in recording and that the corrected information was being forwarded to the welfare fund for the completion of their records and "to enable the authorities to complete the processing of your application regarding your qualifications for pension".

20. Plaintiff forwarded the appropriate months checks for $4 each for dues for the months of October, November and December 1950, and January 1951, to the secretary of Local 1022. These checks were retained but not cashed by the secretary of the local and on March 27, 1951, were returned by the secretary of Local 1022 to plaintiff by registered mail, with notice that the local refused to accept the checks.

21. Further processing of plaintiff's proofs of membership eligibility occurred as follows: Plaintiff appealed to the Special Membership Committee of the International Executive Board, U. M. W. A. On January 31, 1951, the Special Membership Committee notified plaintiff that because of "Constitutional limitations affecting such matters" it could not establish the fact that plaintiff was a current member of the United Mine Workers of America. Pursuant to union law, plaintiff appealed to the National Executive Board, U. M. W. A., on April 20, 1951. The board referred the case to board member Kmetz for investigation.

With due notice to plaintiff Mr. Kmetz set a hearing for May 23, 1951, heard plaintiff and other witnesses and on July 2, 1951, filed with the International President, U. M. W. A., report and recommendation.

22. The gist of board member Kmetz's report follows:

Plaintiff failed to make application to the *local union* for exoneration for the month of September

1947; plaintiff, although employed by the Department of Highways, failed to pay dues at the prescribed rate for employed members for October, November and December 1947 (sec. 12, art. XIV, of the Constitution of 1944 provided for dues at the rate of $1.50 per month plus assessments if any) ; plaintiff paid no dues from October 1947 to November 1948, although employed 11 months out of that period; plaintiff failed to appear before the local union at any time to claim exoneration. In the opinion of the board member Kmetz plaintiff failed to comply with the pertinent provisions of the International Constitution to protect his union membership while employed outside the mining industry. Accordingly Mr. Kmetz recommended that the International Executive Board sustain the findings of the Special Membership Committee of the International Executive Board.

23. In the hearing before board member Kmetz, plaintiff advanced the same excuse as presented here, that plaintiff thought he was exonerated by the secretary of Local 1022. But in the hearing before Mr. Kmetz, Bochak, secretary of Local 1022, appeared and denied that he informed plaintiff that plaintiff was exonerated from any dues payments, and denied that he, Bochak, knew that plaintiff was employed by the Pennsylvania Department of Highways. Bochak was not called as a witness in this action, although available.

24. On October 23, 1951, the International Executive Board adopted the report of board member Kmetz, and on November 1, 1951, International President John L. Lewis notified plaintiff to that effect.

25. The affairs of Local 1022 were taken over by Local 969 in June 1952, after dissolution of Local 1022.

26. On April 28, 1953, the secretary of Local 959 sent a check to plaintiff for $61 purporting to be a refund of dues paid by plaintiff after his membership

was forfeited. On May 13, 1953, the check was returned by plaintiff with a notice to the effect that (a) the amount was incorrect and (b) that plaintiff maintains that he was a qualified member of the union during the period of exoneration and subsequent dues payment and claimed all benefits accruing from membership.

27. On June 4, 1953, the secretary of Local 969 sent a check to plaintiff in the sum of $78.51, purporting to be a refund of dues in a corrected amount, which check was retained by plaintiff.

28. This action was commenced by complaint filed September 14, 1953.

29. Plaintiff ceased active work on January 20, 1955.

30. At the trial of the action plaintiff formally tendered payment of the amount of all dues which according to his computation have become due to the date of the trial ($85.50), which tender was refused by defendants.

31. Plaintiff never received a copy of the Constitution of the International Union, and it is the policy of the U. M. W. A. not to provide individual members of the U. M. W. A. with copies of the constitution unless specially requested or demanded.

### Discussion

The "full authority" granted to the trustees of the Anthracite Health and Welfare Fund is not equivalent to "absolute discretion" or "unlimited discretion", but that authority must be exercised " 'Subject to the stated purposes of the Fund' ": Forrish v. Kennedy, 377 Pa. 370. Hence, the application of any rule of eligibility adopted by the trustees must be in conformity with the stated purpose of the fund, to wit, "to ameliorate and compensate members of the United Mine Workers of America for wage losses and to provide a pension fund in case of retirement".

If a rule of proof of eligibility operates arbitrarily to bar a person factually qualified as a beneficiary of a trust from receiving benefits thereunder, and the trustees fail to give due consideration to the factual situation, they may be considered to have failed to use the discretion or judgment required of them. A court of equity may interpose where the trustee "fails to use his judgment at all because of a mistaken view, either of fact or law, as to the extent of his . . . duties": Brown's Appeal, 345 Pa. 373, cited in Forrish v. Kennedy, supra.

In accordance with the foregoing principles, I am of the opinion that while certification by the union of membership eligibility is most certainly a reasonable requirement in the process of proof, it establishes at the most a prima facie case for or against eligibility. To hold otherwise would be to sanction a transfer of the authority or discretion vested in the trustees to a source not responsible to the trustees. The relationship between trustee and cestui que trust of an irrevocable trust cannot be created or dissolved by any such procedure unless the trust instrument itself so provides. It does not do so here. The establishment of a rational rule of proof cannot operate as a disclaimer of responsibility for decision.

It requires no citation to support the familiar principle that where the establishment of a right or status depends upon the operation of the laws of a private society, the procedure established by such laws must be observed, resort must be had to its internal tribunals, and all remedies within the organization itself exhausted before recourse may be had to the courts. The courts will interfere with the decisions of such organizations only when such decisions are arrived at arbitrarily, or capriciously, without affording to claimant the basic requirements of due process, by fraud or chicanery, or are based on patent mistakes

of law or of fact. The law or procedure of a private society cannot operate to deny a personal or property right accruing to a member of that society by virtue of his membership, except in accordance with established principles of justice.

The decision of the United Mine Workers of America denying certification to plaintiff was not in any sense arbitrary or capricious, it was obviously made with the utmost attention to the requirements of due process and the decision was made with sincere application of the principles of interpretation of union law as customary in the union.

I am constrained to hold, however, that a fundamental mistake of law was made in not finding that the factual situation disclosed a waiver by the union of the various constitutional requirements for the payment of dues by members of the union displaced from the industry and either idle or taking employment in another industry.

On the evidence before me I must hold that plaintiff made a substantial effort to preserve his good standing in the union, reported his status, observed the instructions of the secretary of his local union, paid the dues he was instructed to pay when and as instructed, *and that* these dues were received, transmitted and recorded without protest by either the local or district union for a period of 11 months, and received for an additional period of four months without refusal.

Obviously plaintiff was in complete error as to his exoneration privileges and his dues responsibilities according to the letter of the constitution of the International Union, but to whom was he to look for instruction if not to the person he considered the responsible local officer, particularly in view of the admitted union policy of restricted distribution of its constitution?

In Forrish v. Kennedy, supra, these same trustees refused to pay a pension to a claimant certified by the union as to membership for the reason that claimant had been engaged in an occupation which according to the constitution prohibited membership in the union. The Supreme Court held that by accepting claimant's membership dues the union evidently elected to waive the prohibition, and its action had been in no way impeached by the International.

If there was reason for waiver in that case in face of the flat prohibition in the International Constitution, all the more so in this case, where plaintiff was advised by a responsible union officer as to a course of action. If that official was in error and misled plaintiff, there is no reason why plaintiff should suffer.

It is of some significance as to the actual situation that, although the secretary of Local 1022 appeared before the investigator for the International Board, and according to the report therein denied advising plaintiff as to exoneration, or as to plaintiff's status while in other employment, yet that same individual, though available, was not called as a witness in this proceeding to rebut the sworn testimony of plaintiff.

Suggestion is advanced that the acceptance by plaintiff of the dues returned to him constitutes an acceptance by plaintiff in the decision of the International Board. Plaintiff had previously notified Local 969, returning the dues two years after the certification proceedings, that plaintiff proposed to waive no rights accrued as a member. By accepting the returned payments plaintiff waived nothing, acquiesced in nothing and from a practical standpoint would be foolish to reject the check. The law does not require people to do vain or useless things to protect an asserted legal right.

It is conceded that prior to January 20, 1955, plaintiff had established no wage loss by reason of retire-

ment, hence any pension rights accrue from that date on.

To summarize: I am of the opinion that the trustees of the Anthracite Health and Welfare Fund failed to exercise the discretion required of them in refusing to process plaintiff's pension application to a decision, that plaintiff, in November 1951, was a member in good standing of the United Mine Workers of America, that any constitutional irregularities in plaintiff's status as a current member of the U. M. W. A. were waived by the action of the local and district officers in accepting his dues after a period of nonpayment under his belief of exoneration, that plaintiff should have been certified by the union as to membership eligibility and that plaintiff having met all the other qualifications is entitled to a pension upon the establishment of a wage loss by reason of retirement.

## Conclusions of Law

1. Plaintiff, at attainment of age 60 and as of the date of filing his application for pension benefits from the Anthracite Health and Welfare Fund, was a member of good standing or a "current member" of the United Mine Workers of America, District No. 1, had worked in the anthracite industry for more than 20 years and on the establishment of a wage loss by reason of disability or retirement would be entitled to a pension as a beneficiary of the fund.

2. Plaintiff has established a wage loss not otherwise compensated for by reason of retirement from service in anthracite industry and from ceasing any other employment from January 20, 1955.

3. Plaintiff is entitled to be paid the sum of $250 accrued benefits at the rate of $50 per month, to include the month of June 1955.

4. Plaintiff is entitled to continuing pension benefits at the rate of payment prescribed by the trustees,

so long as plaintiff remains eligible therefor by means of wage loss not otherwise compensated for and in conformity with appropriate rules established by the trustees for the administration of the fund.

### Decree Nisi

Now, June 29, 1955, it is ordered:

1. That the trustees of the Anthracite Health and Welfare Fund pay to plaintiff the sum of $250 accrued pension benefits to include June 1955.

2. That commencing with the month of July 1955, the trustees pay to plaintiff pension benefits at the rate established by the trustees, subject to the rules of the trustees as to continuing eligibility by reason of wage loss or other rules applying to all pension beneficiaries.

3. Costs to be paid by defendants.

### Opinion Sur Exceptions to Adjudication

HOBAN, P. J., April 2, 1956. — The question concerns the sufficiency of proof of plaintiff's current membership in the United Mine Workers of America, as an eligibility qualification for pension benefits from the Anthracite Health and Welfare Fund.

We think the principles may be stated as follows: The trustees may not delegate to the union or anyone else the power and duty to decide whether or not an applicant is entitled to a pension or other benefit under the fund. The original contract provides no such authority. In the process of proof of eligibility the trustees may require certification of membership by the union, and may accept, but are not required to accept, such certification as proof of current membership. See testimony of McNelis, Executive Secretary, record, page 46. The trustees have the right to make their own investigation regardless of favorable certification.

Conversely, if the union refuses certification, the trustees are obliged to make their own investigation

and final decision, when the applicant shows that the union decision is arbitrary or based on a mistake of fact or law. Any other holding would permit the trustees to abdicate their responsibilities.

Accordingly, we concur with the opinion of the chancellor that the failure of certification offered no excuse to the trustees to pigenohole plaintiff's application, instead of processing it to a decision on the merits and is no bar to this action.

We may grant the bona fides of the union investigation and decision as to plaintiff's membership status, but as the chancellor pointed out, the union tribunal failed to consider the proposition of waiver of dues requirements. The union's decision was based on a mistake of law and, therefore, offered no legal excuse for the trustees to ignore plaintiff's application. See Forrish v. Kennedy, 377 Pa. 370, in which is discussed the limitation of the trustees' discretion, and the right of the court to interpose when the trustees' action or inaction is based on a mistaken view either of law or of fact.

Objection is made by defendants that plaintiff had not exhausted his remedy within the union, because he could have appealed his case from the International Executive Board to an International Convention. The argument is captious. See O'Neill v. United Plumbers, etc., 348 Pa. 531. And the argument ignores the fact that plaintiff is required to prove his eligibility to the trustees, not to the union.

Union participation in the processing of an application is without doubt a sensible and desirable procedure, for the union has a definite interest in protecting the integrity of the fund against ineligibles as well as in maintaining its own membership in current status. Furthermore it has the available machinery for immediate determination of an applicant's union status. But the union is not infallible, and if it is wrong as a

matter or law or fact, the prospective pensioner must have his day in court to prove it so.

Accordingly on the facts found by the chancellor we concur with his conclusions of law.

Plaintiff has filed a single exception to the chancellor's finding of fact no. 27. The record is somewhat confusing, but apparently there was no dissent by defendants to plaintiff's assertion that the check for $78.51 was returned by plaintiff to the secretary of the local union. In our opinion the matter is of no significance since, as the chancellor said, the law does not require people to do vain and useless things to protect an asserted legal right. For the sake of the record, however, we sustain plaintiff's exception and will revise finding of fact no. 27 to conform.

Defendants except to finding of fact no. 30 and the failure of the chancellor to find that plaintiff has not exhausted his remedies in the union, that the chancellor had failed to find that plaintiff's membership had not been certified by the proper union agency, and that the chancellor had failed to find as a fact that the membership of plaintiff in the union cannot be adjudicated in this proceeding because the union is not a party to this action.

Finding no. 30 is based on a fact of record, an offer made in open court. Apparently what defendant objects to is the legal significance of the matter, but it is an undeniable fact. The question of plaintiff's responsibility to procure union adjudication has been resolved as a matter of law. The facts concerning certification or lack of it are fully covered in finding of fact no. 17. The power of equity to consider plaintiff's status as a union member is a matter of law, not a question of fact, and we have so treated it.

Finally, none of the facts the subject of defendants' "failure to find" exceptions were the subject of formal

requests submitted to the chancellor. Defendant's exceptions are, therefore, overruled.

Now, April 2, 1956, it is ordered:

1. Plaintiff's exception to finding of fact no. 27 is sustained, and the finding is revised to read as follows:

No. 27. On June 4, 1953, the secretary of Local 969 sent a check to plaintiff in the sum of $78.51, purporting to be a refund of dues in a corrected amount, which check was refused by plaintiff and returned to the secretary of Local 969.

2. Defendants' exceptions numbered 1, 2, 3 and 4 to the chancellor's findings of fact, defendants' exceptions numbered 5, 6 and 7 to the chancellor's conclusions of law, and defendants' exceptions numbered 8, 9 and 10 to the decree nisi are all overruled.

3. The decree nisi of June 29, 1955, is affirmed and is directed to be entered as the final decree.

*Final Decree Verbatim*

Now, April 2, 1956, is is ordered:

1. Plaintiff's exception to finding of fact no. 27 is sustained, and the finding is revised to read as follows:

No. 27. On June 4, 1953, the secretary of Local 969 sent a check to plaintiff in the sum of $78.51, purporting to be a refund of dues in a corrected amount, which check was refused by plaintiff and returned to the secretary of Local 969.

2. Defendants' exceptions numbered 1, 2, 3 and 4 to the chancellor's findings of fact, defendants' exceptions numbered 5, 6 and 7 to the chancellor's conclusions of law, and defendants' exceptions numbered 8, 9 and 10 to the decre nisi are all overruled.

3. The decree nisi of June 29, 1955, is affirmed and is directed to be entered as the final decree.